1

2

3

4

5

6

7

8

## UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MARGARET WEIS, LLC, a Wisconsin Limited Liability Company; TRACY HICKMAN, an individual,<br><br>            Plaintiffs,<br><br>    v.<br><br>WIZARDS OF THE COAST LLC, a Delaware Limited Liability Company,<br><br>            Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1) **BREACH OF CONTRACT;**<br>2) **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; AND**<br>3) **TORTIOUS INTERFERENCE WITH CONTRACT**<br><br>**JURY DEMAND.** |

Plaintiffs MARGARET WEIS, LLC and TRACY HICKMAN, for their Complaint

against WIZARDS OF THE COAST, LLC ("Defendant"), allege as follows:

### NATURE OF THE ACTION

1.    Margaret Weis ("Weis") and Tracy Hickman ("Hickman") (collectively with

Margaret Weis, LLC, "Plaintiff-Creators") are among the most widely-read and successful living

authors and world-creators in the fantasy fiction arena. Over thirty-five years ago, Plaintiff-

Creators conceived of and created the Dragonlance universe—a campaign setting for the

"Dungeons & Dragons" roleplaying game, the rights to which are owned by Defendant. (In

Dungeons & Dragons, gamers assume roles within a storyline and embark on a series of

adventures—a "campaign"—in the context of a particular campaign setting.)

PARSONS, BEHLE & LATIMER<br>1032 34th Avenue E<br>Seattle, Washington 10001<br>Tel: (801) 536-6761

2.      Plaintiff-Creators' conception and development of the Dragonlance universe has given rise to, among other things, gaming modules, video games, merchandise, comic books, films, and a series of books set in the Dungeons & Dragons fantasy world. While other authors have been invited to participate in creating over 190 separate fictional works within the Dragonlance universe, often with Plaintiff-Creators as editors, Weis's and Hickman's own works remain by far the most familiar and salable. Their work has inspired generations of gamers, readers and enthusiasts, beginning in 1984 when they published their groundbreaking novel *Dragons of Autumn Twilight*, which launched the Dragonlance Chronicles trilogy. Their books have sold more than thirty million copies, and their Dragonlance World of Krynn is arguably the most successful and popular world in shared fiction, rivaled in the fantasy realm only by the renowned works created by J.R.R. Tolkien (which do not involve a shared fictional world). Within the Dragonlance universe, Plaintiff-Creators have authored or edited 31 separate books, short story anthologies, game materials, and art and reference books in a related series of works all dedicated to furthering the Dungeons & Dragons/Dragonlance brand.

3.      In or around 2017, Plaintiff-Creators learned that Defendant was receptive to licensing its properties with established authors to revitalize the Dungeons & Dragons brand. After a ten-year hiatus, Plaintiff-Creators approached Defendant and began negotiating for a license to author a new Dragonlance trilogy. Plaintiff-Creators viewed the new trilogy as the capstone to their life's work and as an offering to their multitude of fans who had clamored for a continuation of the series. Given that the Dragonlance series intellectual property is owned by Defendant, there could be no publication without a license. In March, 2019, the negotiations between the parties hereto culminated in new written licensing agreement whereby Weis and Hickman were to personally author and publish a new Dragonlance trilogy in conjunction with Penguin Random House, a highly prestigious book publisher (the "License Agreement").

4.      By the time the License Agreement was signed, Defendant had a full overview of the story and story arc, with considerable detail, of the planned trilogy. Defendant knew exactly

COMPLAINT
Case No.
Page No. 2

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

the nature of the work it was going to receive and had pre-approved Penguin Random House as the publisher. Indeed, Defendant was at all times aware of the contract between Penguin Random House and Plaintiff-Creators (the "Publishing Agreement") and its terms. In fact, the License Agreement expressly refers to the Publishing Agreement.

5.      By June 2019, Defendant received and approved a full outline of the first contracted book in the trilogy ("Book 1") and by November 2019 the publisher accepted a manuscript for Book 1. Plaintiff-Creators in turn sent the Book 1 manuscript to Defendant, who approved it in January 2020. In the meantime, Defendant was already approving foreign translation rights and encouraging Plaintiff-Creators to work on the subsequent novels.

6.      During the development and writing process, Plaintiff-Creators met all contractual milestones and received all requisite approvals from Defendant. Defendant at all times knew that Hickman and Weis had devoted their full attention and time commitment to completing Book 1 and the trilogy as a whole in conformity with their contractual obligations. During the writing process, Defendant proposed certain changes in keeping with the modern-day zeitgeist of a more inclusive and diverse story-world. At each step, Plaintiff-Creators timely accommodated such requests, and all others, within the framework of their novels. This collaborative process tracks with Section 2(a)(iii) of the License Agreement, which requires Defendant to approve Plaintiff-Creators' drafts or, alternatively, provide written direction as to the changes that will result in Defendant's approval of a draft.

7.      On or about August 13, 2020, Defendant participated in a telephone conference with Plaintiff-Creators' agents, which was attended by Defendant's highest-level executives and attorneys as well as PRH executives and counsel. At that meeting, Defendant declared that it would not approve any further Drafts of Book 1 or any subsequent works in the trilogy, effectively repudiating and terminating the License Agreement. No reason was provided for the termination. (In any event, no material breaches or defaults were indicated or existed upon which to predicate a termination.) The termination was wholly arbitrary and without contractual basis.

COMPLAINT
Case No.
Page No. 3

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

The termination was unlawful and in violation of multiple aspects of the License Agreement (arguably almost every part of it, in fact). The termination also had the knowing and premeditated effect of precluding publication and destroying the value of Plaintiff-Creators' work—not to mention their publishing deal with Penguin Random House.

8.      Defendant's acts and failures to act breached the License Agreement and were made in stunning and brazen bad faith. Defendant acted with full knowledge that its unilateral decision would not only interfere with, but also would lay waste to, the *years* of work that Plaintiff-Creators had, to that point, put into the project. Given that the obligation to obtain a publisher was part and parcel of the License Agreement, Defendant was fully cognizant that its backdoor termination of the License Agreement would nullify the millions of dollars in remuneration to which Plaintiff-Creators were entitled from their publishing contract.

9.      As Plaintiff-Creators subsequently learned, Defendant's arbitrary decision to terminate the License Agreement—and thereby the book publishing contract—was based on events that had nothing to do with either the Work or Plaintiff-Creators. In fact, at nearly the exact point in time of the termination, Defendant was embroiled in a series of embarrassing public disputes whereby its non-Dragonlance publications were excoriated for racism and sexism. Moreover, the company itself was vilified by well-publicized allegations of misogyny and racist hiring and employment practices by and with respect to artists and employees unrelated to Dragonlance. Plaintiff-Creators are informed and believe, and based thereon allege, that a decision was made jointly by Defendant and its parent company, Hasbro, Inc., to deflect any possible criticism or further public outcry regarding Defendant's other properties by effectively killing the Dragonlance deal with Plaintiff-Creators. The upshot of that was to inflict knowing, malicious and oppressive harm to Plaintiff-Creators and to interfere with their third-party contractual obligations, all to Plaintiff-Creator's severe detriment and distress.

///

///

COMPLAINT
Case No.
Page No. 4

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

1

## JURISDICTION AND VENUE

2    10.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is diversity of

3  citizenship between the parties and the amount in controversy exceeds, exclusive of costs and

4  interest, the sum of seventy-five thousand dollars ($75,000). Plaintiff Margaret Weis, LLC is a

5  citizen of the State of Wisconsin as its sole member, Margaret Weis, is a citizen of and domiciled

6  in the State of Wisconsin. Plaintiff Tracy Hickman is a citizen of and domiciled in the State of

7  Utah. On information and belief, Defendant Wizards of the Coast, LLC is a citizen of the State of

8  Rhode Island due to the fact that Defendant is wholly-owned by a single member—Hasbro, Inc.,

9  which is a corporation duly organized and existing under the laws of the State of Rhode Island,

10  with its principal place of business in Pawtucket, Rhode Island.

11    11.    The Court also has jurisdiction over the subject matter of this action for

12  declaratory relief under 28 U.S.C. §§ 2201 and 2202 and for pendent state claims.

13    12.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(a) and (c) in

14  that Defendant resides in this Judicial District and the parties have stipulated to venue in

15  Washington State by contract, a true and correct copy of which contract (the License Agreement)

16  is attached hereto.

17

## PARTIES

18    13.    Plaintiff Margaret Weis, LLC, is a Wisconsin limited liability company through

19  which renowned and bestselling author Margaret Weis conducts business. Ms. Weis and her

20  LLC at all relevant times herein have been Wisconsin residents, domiciled in Williams Bay,

21  Wisconsin.

22    14.    Plaintiff Tracy Hickman, an individual, is a renowned and bestselling author, who

23  at all relevant times has been a Utah resident, domiciled in South Jordan, Utah.

24    15.    Defendant Wizards of the Coast LLC is a Delaware limited liability company

25  with its primary place of business located at 1600 Lind Avenue Southwest, Suite 400, Renton,

26  Washington 98057.

COMPLAINT
Case No.
Page No. 5

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

1  **FACTS AND AVERMENTS**

2  **COMMON TO ALL CAUSES OF ACTION**

3  16.  Margaret Weis and Tracy Hickman are two of the most widely-read and beloved

4  authors in the fantasy fiction universe. To fans of the genre, they are rock stars. Their works have

5  routinely appeared on the New York Times Best Sellers list. Their books and ancillary sales

6  generate tens of millions of dollars.

7  17.  In 1997, prior to seeking Weis's and Hickman's assistance, Defendant acquired

8  the Dungeons & Dragons brand from a failing entity known as TSR, Inc. As a result of Plaintiff-

9  Creators' contributions, Defendant staged a dramatic resurgence for the Dungeons & Dragons

10  brand. Based on this resurgence, in 1999, Defendant was acquired by, and is now a subsidiary of,

11  Hasbro, Inc. ("Hasbro"). Hasbro is a publicly traded multi-national manufacturer of toys and

12  children's products with annual revenues in excess of $4.5 billion, that owns, among other

13  things, an expanding line of digital and traditional media and entertainment properties.

14  18.  On or about August 30, 2017, after more than a decade away from the

15  Dragonlance franchise and encouraged by Defendant's announcement of a licensing deal with

16  another author with experience writing for the Dungeons & Dragons brand, Plaintiff-Creators

17  emailed Liz Schuh, Defendant's representative, inquiring about renewed licensing opportunities

18  for the Dungeons & Dragons/Dragonlance property. Defendant responded positively the very

19  next day and a meeting was arranged for early September 2017.

20  19.  Once Defendant expressed interest, Plaintiff-Creators began negotiating with

21  book publishers with respect to a book publication and marketing deal. The negotiations with

22  regard to the License Agreement and Publishing Agreement were open as between the parties as

23  the two contracts went hand in glove. Obviously, in the context of Dragonlance, a publishing

24  contract without the license would be worthless and a license without publishing contract would

25  likewise be worthless.

26  ///

COMPLAINT
Case No.
Page No. 6

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

20.     By December 2017, Plaintiff-Creators approached Penguin Random House ("PRH"), a renowned and high-quality book publisher, to pre-sell the publication rights to the contemplated new trilogy. As set forth below, this contact grew into a later-completed book publication contract with PRH. Defendant was at all times aware of these third-party PRH negotiations and contract, and expressly included reference to the deal in the License Agreement. Defendant was specifically aware that the PRH contract provided a minimum advance to Plaintiff-Creators for all three works, with significant additional financial incentives along the way. Indeed, with additional performance bonuses, royalties and ancillary income streams, and given the pent-up demand for new works by Plaintiff-Creators, the Penguin Random House deal was worth in excess of $10 million to Plaintiff-Creators.

21.     As part of the negotiations with Defendant and PRH, Plaintiff-Creators had to show their work concepts, storylines, plots and characters to each, and Defendant expressly acknowledged receipt of same in the License Agreement. In short, Defendant was fully apprised of the scope, nature and content of the trilogy and agreed to go forward with the grant of license on that basis.

22.     On or about February 28, 2019, Defendant and PRH (technically, Del Rey Books, an imprint of Random House Publishing Group, which is a division of Penguin Random House) entered into a side agreement that was essentially a building block for the final License Agreement (the "Side Agreement"). In that Side Agreement, Defendant not only specifically acknowledged PRH's pivotal role in the licensing arrangement with Plaintiff-Creators, but also expressly made clear that the license was going to be conveyed *in toto* to Plaintiff-Creators with only a few stipulations as to ownership of the underlying intellectual property to Dungeons & Dragons/Dragonlance and with very limited "approval and consultation rights" reserved to Defendant, all of which related to marketing of the books (book jacket art, press releases, advertising copy, author tour and certain facets of a potential digital e-book edition).

///

COMPLAINT
Case No.
Page No. 7

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

23.     Each of the Parties, including third-party PRH, recognized that, in the context of producing the trilogy, a license or licensing agreement that could be retracted arbitrarily at the whim of Defendant (or its corporate parent) would be illusory and ineffective. In any case, it would hardly be the basis for either the Plaintiff-Creators or the publisher (any publisher, in fact), to move forward with the transaction. To the contrary, the whole point of the contemplated set of agreements was to give all parties (including third-party PRH) assurances that the license was in place and the contractual predicates were set in stone so that the project could be completed.

24.     On or about March 21, 2019, after the tripartite negotiations had concluded, and after Plaintiff-Creators presented acceptable story outlines and concepts for their work to Defendant, the Parties executed the License Agreement.

25.     On March 29, 2019, Plaintiff-Creators and PRH entered into the Publishing Agreement. PRH remitted the signing payment due under the Publishing Agreement to Plaintiff-Creators in April 2019. Per the terms of the License Agreement, Plaintiff-Creators in turn remitted a portion of the signing payment to Defendant—an amount Defendant continues to retain despite having effectively terminated the License Agreement.

26.     Per the License Agreement, Defendant transferred rights to the Dungeons & Dragons/Dragonlance brand expressly for the writing, marketing and sale of that trilogy of Dragonlance books to Plaintiff-Creators. Defendant was at all times aware that the contemplated works, which were a massive and comprehensive literary undertaking, would be a multi-year endeavor. Accordingly, certain milestones were set whereby Defendant, having approved the story concept, storyline and story arc, reserved the right to approve certain narrowly defined deliverables, primarily limited to the marketing of the work. The approvals were never meant to be a replacement for the express and narrow termination provisions in the Agreement. In fact, each of the approval provisions had a specific allowance for Plaintiff-Creators to amend or rewrite their work or marketing to fit within the licensed brand. None of the approval items were

COMPLAINT
Case No.
Page No. 8

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

grounds for revocation/termination of the License Agreement.

27.    By June 2019, Defendant/Hasbro expressly approved a detailed outline of Book 1. In November 2019, PRH indicated that the complete manuscript of Book 1 was accepted and it would push through the second payment due on the Publishing Agreement. At that time, Plaintiff-Creators submitted the complete manuscript of Book 1 to Defendant/Hasbro who expressly approved the Book 1 manuscript in January 2020. Inexplicably, and despite Plaintiff-Creators' repeated request, PRH never actually delivered the second payment due on approval of the Book 1 manuscript.

28.    In compliance with the License Agreement, drafts of the Book 1 manuscript were shared and approved by Defendant. In fact, on January 21, 2020, Defendant, through the Hasbro Property Group approval system, specifically approved the Book 1 manuscript via written approval #272074-0. Book 1 was now provisionally identified and named *"Dragons of Deceit."* By late 2019, Plaintiff-Creators had also completed substantial work on the Book 2 manuscript.

29.    Relatedly, by December 2019, PRH had negotiated a German translation deal for Plaintiff-Creators' works. At each phase of the above activities, Plaintiff-Creators obtained separate approvals from Defendant (through the Hasbro Property Group approval system), and, with Defendant's knowledge, transmitted those approvals to PRH. At all times relevant hereto, Defendant was aware of the publishing process at work and approved of Plaintiff-Creators' work.

30.    In or about June 2020, Defendant changed the editorial and oversight team assigned to the new Dragonlance trilogy, removing Liz Schuh and Hilary Ross and replacing them with Nic Kelman and Paul Morrissey. Mr. Kelman, who was and remains Defendant's Head of Story and Entertainment, was a controversial choice. As recently as 2019, his own publication as author of the sexually explicit novel, *"Girls: A Paean"* was subject to ongoing public discussions of whether his work contained or promoted misogyny and pedophilia. *See, e.g.,* https://medium.com/@aemarling/nic-kelman-hypocrisy-80d9c1edca71 (the Medium article

COMPLAINT
Case No.
Page No. 9

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

1  itself contains "trigger warnings" of "implied sexual abuse & statutory rape").

2       31.    Following Mr. Kelman's assignment to Defendant's Dragonlance team,

3  Defendant issued a four-point set of comments dealing with various sensitivity issues ranging

4  from the use of love potions in the story, as referenced in the *5E Dungeons Masters Guide*, to

5  concerns of sexism, inclusivity and potential negative connotations of certain character names.

6  On each occasion when the publisher or Defendant, directly or indirectly, expressed reservations

7  about the text or requested rewrites, including "sensitivity rewrites," Plaintiff-Creators

8  accommodated such requests and provided rewrites, in one case, 70 pages-worth. Regardless, at

9  no point in time was there any indication of any problem with the writing or re-writing process.

10  In fact, given that the process was moving forward, Plaintiff-Creators also informed Defendant

11  that they had completed Book 2 of the trilogy, provisionally titled, *"Dragons of Fate."*

12       32.    By early to mid-2020, particularly in the July 2020 timeframe—separate from

13  anything having to do with Dragonlance—Defendant was engulfed in controversies. Specifically,

14  Defendant was subject to a drumbeat of negative publicity related to alleged "pervasive racism"

15  and various forms of cultural insensitivity/offensiveness in connection with its *"Magic: The*

16  *Gathering"* trading cards as well as with its professional hiring and advancement practices

17  within the company. In particular, beyond the issue of Mr. Kelman, who remained controversial,

18  the hiring of alleged white supremacist/alt-right/QAnon-affiliated story artist (Terese Nielsen)

19  was targeted by Defendants' detractors, as was alleged over-sexualizing of the work (by content

20  creator Lizbeth Eden).

21       33.    Further, certain allegations made against Defendant by Defendant's former

22  employee, Orion Black, a self-described "nonbinary Black person," became a media sensation.

23  As a result, Defendant issued a public apology, which, in turn, only fanned the flames of

24  consumer/Twitter/Internet blowback against Defendant all the more. On information and belief,

25  the aforementioned controversies came to the attention of, and were addressed at, the "highest

26  levels" by Defendant's parent company, Hasbro.

COMPLAINT
Case No.
Page No. 10

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

34.     Plaintiff-Creators ultimately discovered that, at the same time Defendant was under public siege, Defendant was interacting and communicating directly with PRH on editorial topics related to Book 1 and the trilogy with the intent of actively interfering with Plaintiff-Creators' business relationships.

35.     On or about August 13, 2020, acting with the knowledge and consent and possibly at the direction of Hasbro, Defendant held a telephonic meeting with Plaintiff-Creators and their representatives. Among those present at the meeting were Messrs. Kelman and Morrissey, Defendant's in-house lawyers, Nick Mitchell and Ben Hellerstein, and various PRH representatives, including executives and counsel. At that telephonic meeting, without any forewarning, Defendant's attorney (Mr. Mitchell) stated Defendant refused to perform under the License Agreement, effectively terminating the agreement unilaterally. When challenged about the grounds for such termination, Mr. Mitchell responded with the nonsensical statement, "We are not moving toward breach, but we will not approve any further drafts."

36.     Defendant's statements and conduct were a stunningly bad faith effort to circumvent the termination provision of the Agreement. By expressly withdrawing its future approvals, Defendant effectively (1) terminated Plaintiff-Creators ability to publish their work; (2) destroyed Plaintiff-Creators' ability to mitigate or modify their storylines or marketing materials to address any approval issues; and (3) knowingly interfered with Plaintiff-Creators' third party contract with PRH, resulting in the loss of not only the guaranteed advance, but royalties, incentive payments, and the exploitation of the sublicensing rights of the Licensed Property that would easily eclipse the guaranteed advance, depriving Plaintiffs of millions of dollars over the term of the License Agreement.

37.     As will be subject to proof at trial, Defendant's acts were not privileged under the License Agreement and are not subject to any of the contractual limitations on damages. Further, Defendant's conduct, alone or in conspiracy with Hasbro, with respect to the PRH Publishing Agreement, was conducted with malicious and oppressive intent for the sole purpose of silencing

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

1  and harming Plaintiff-Creators. Such acts were for corporate reasons that, on information and

2  belief, had to do with Defendant's and Hasbro's public relations disasters with respect to

3  Defendant's workplace management and intellectual properties unrelated to the Dragonlance

4  trilogy for which Plaintiff-Creators endeavored over so many years to create, complete, and

5  bring to fruition on behalf of their eager readership.

6  ### FIRST CLAIM FOR RELIEF

7  **(Breach of Contract/Specific Performance)**

8     38.   Plaintiff incorporates by this reference each and every allegation contained in

9  paragraphs 1 through 37, inclusive, as if set forth in full herein.

10    39.   Plaintiff-Creators and Defendant entered into a valid and binding contract on or

11 about March 21, 2019, which contract is identified above as the License Agreement.

12    40.   Defendants, in entering into the License Agreement with Plaintiff-Creators,

13 granted Plaintiff-Creators a "non-exclusive right to use, copy, prepare derivative works of,

14 display, perform and distribute the Property ('Licensed Property') [*i.e.,* D&D/Dragonlance]

15 solely for the purpose of … development, publication, distribution [and] sale…of the Works

16 [defined in the "Key Terms" as the new trilogy]." License Agreement at §1(a)(i).

17    41.   The existence and centrality of the PRH contract to the License Agreement was

18 "baked in" to the License Agreement. To this end, the License Agreement provided Plaintiff-

19 Creators with an exclusive sublicense with respect to publication. Specifically, Defendant agreed

20 that, "Licensor grants to Licensees an exclusive right to sublicense the Licensed Property as used

21 in the Works [the trilogy] to publishers . . . Notwithstanding anything herein to the contrary,

22 Licensor has approved of Penguin Random House ("PRH") as a publisher of the Works, and

23 agrees that Licensee can sublicense the Licensed Property to PRH for the Term is [sic—"in"]

24 this Agreement or until the agreement between Licensee and PRH has expired or terminated."

25 License Agreement at §1(a)(ii).

26 ///

COMPLAINT
Case No.
Page No. 12

42.    Given that the License Term as set forth in the Key Terms of the Agreement stipulates a ten (10) year term, the PRH contract, that mirrors that provision, has not expired or terminated.

43.    Nowhere in the License Agreement did Defendant assert, stipulate or contend that it was granting a revocable license other than with respect to the ten-year term. Specifically, in the Key Terms sheet, Defendant made clear that the ten-year term commenced from the first sale of the third book and expired ten years later or by December 31, 2032, whichever was first. License Agreement, Exhibit A thereto (Key Terms).

44.    The obligations under the License Agreement are clearly set forth in Section 2 of the Agreement itself. Specifically, Plaintiff-Creators were obligated to set the work in the Dragonlance "campaign setting;" use good faith to develop and publish at least one work per year; secure a publishing deal and comply with a few other marketing responsibilities. License Agreement at §2(a)(i–ii), (iv–vii).

45.    Significantly, Section 2(a)(iii) provides that, "Licensees shall submit drafts of each work ('Drafts') to Licensor for review and approval prior to publication. Within a mutually agreed time period, not to exceed ten (10) days, following receipt of each such Draft, **Licensor shall respond in writing to Licensees, advising Licensees whether such Draft is acceptable to Licensor, and, if not acceptable, advising Licensees in reasonable detail of the changes necessary in order to render such Draft acceptable to Licensor.**" License Agreement at §2(a)(iii) (Emphasis added.)

46.    Nothing in the above provision allows Defendant to terminate the License Agreement based on Defendant's failure to provide approval. To the contrary, should Defendant find any aspect of the Draft to be unacceptable, Defendant has an *affirmative duty* under contract to provide "reasonable detail" of any changes Plaintiff-Creators must make, which changes will result in Defendant's approval of the manuscript. Accordingly, for Defendant to make the blanket statement that it will never approve any Drafts going forward is, by itself, a breach of the

COMPLAINT
Case No.
Page No. 13

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

License Agreement.

47.     Section 2(b) in the License Agreement itemizes two significant obligations on the part of Defendant. Specifically, this subsection provides that, "Licensor shall provide Licensees with story guides for use in the development of the Works" and "Licensor shall provide a reasonable amount of consultation to Licensees throughout the development of each Work." License Agreement at §2(b). Having summarily announced that it would no longer approve any Drafts, Defendant separately violated and breached Section 2(b) of the License Agreement.

48.     Section 3 of the License Agreement separately obligated Defendant to provide specific approvals of various aspects of the Works. Section 3 does not supersede the Draft approval process in Section 2(a)(iii). To this end, Section 3 provides, "Details related to each of the Works development plan, publication, sales and marketing, including schedules, milestones, Localizations, advertising and marketing materials, each Marketing Plan, websites, promotions, publishers and other matters reasonably requiring approval are also subject to Licensor's approval. Notwithstanding anything provided in this Agreement to the contrary, any approval by Licensor shall not be unreasonably withheld, delayed or conditioned, with the understanding that if Licensor fails to approve a matter or item, such non-approval shall be deemed reasonable; licensor will approve or disapprove all submissions within ten (10) business days of receipt." License Agreement at §3.

49.     This provision limits the (arguably illusory) "reasonableness factors" to the enumerated items and makes clear that there is a submission process that must be followed and there is no basis to assert that all submissions (of drafts for example) will be rejected out-of-hand. Again, this constitutes a separate breach.

50.     The breach is further put into focus in terms of Sections 3(b) and 3(c). Tellingly, the Draft approval process is excluded from Section 3(a)—because it is in Section 2(a)(iii)—and Section 3(c) makes clear that there is a "resubmission" process in any event. Defendants statements and acts have rendered any further performance via submission, resubmission or

COMPLAINT
Case No.
Page No. 14

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

1  revision by Plaintiff-Creators futile and has breached and frustrated the purpose of the License

2  Agreement.

3       51.     Defendant is in further and separate breach of contract because it has terminated

4  the contract outside the termination provisions as set forth as Section 9 of the License

5  Agreement. There are essentially six grounds for termination, none of which apply to

6  Defendant's conduct. Section 9 states in pertinent part: "If Licensees materially breach this

7  Agreement, and such breach is not cured within thirty (30) days of the receipt by Licensees of

8  written notice thereof, then Licensor shall have the right to terminate . . . Licensor may also

9  terminate . . . upon written notice . . . upon the occurrence of the following events (each of which

10  is a 'Default'): (i) A Licensee (or Licensees) fails to comply with the approval or quality

11  requirements . . . ; (ii) the Works do not comply with the applicable laws or regulations;

12  (iii) Licensees sell or cause to sell one or more of the Works outside the Licensed Channel of

13  Distribution; or (iv) Licensee's repeated failure to affix proper copyright and trademark notices."

14  License Agreement at §9.

15       52.     There is an additional non-enumerated termination provision in Section 9 that

16  allows termination "if Licensees fail to make a payment or furnish a statement in accordance

17  herewith and fails to remedy such failure within thirty (30) days of written notice thereof." *Id*.

18       53.     Clearly, because this is a License Agreement upon which known third party

19  publishing rights depend, the grounds for termination were purposefully narrow.

20       54.     None of the termination provisions were triggered, nor was there a claim of

21  material breach much less written notice thereof, nor was a 30-day cure period initiated. While it

22  is clear that, for reasons of its own, Defendant wished to terminate the License Agreement, it

23  could not do so under Section 9. Instead, acting in complete and stunning bad faith, Defendant

24  repudiated the License Agreement by simply announcing that Defendant would never approve

25  any further drafts and, in fact, did not approve the actual draft that was pending. That said,

26  Defendant did not provide any cause for its non-approval (reasonable or not) and certainly

COMPLAINT
Case No.
Page No. 15

PARSONS, BEHLE & LATIMER
1032 34ᵗʰ Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

1  provided no opportunity to address or cure the cause of non-approval, as is required by contract,

2  thereby creating yet another express breach of contract.

3      55.    Plaintiff-Creators fully performed all acts required of them under the terms of the

4  License Agreement, with the exception of those acts excused by Defendant's conduct.

5      56.    On or about August 13, 2020 via the statement and actions set forth above,

6  Defendant breached the License Agreement by:

7          a.    asserting that it would never provide any of the subsidiary approvals for any draft

8              manuscripts going forward; those statements and actions comprised a unilateral

9              actual and de facto revocation of the License and termination of the License

10             Agreement contract, rendering any further writing endeavors related to the trilogy

11             useless and rendering performance of the PRH contract impossible due to the

12             inherent threat of an action for injunction and damages against PRH for theft of

13             intellectual property in the event Defendant-Creators and/or PRH proceeded with

14             publication, which, to date, they have not due to Defendant's conduct;

15         b.    failing to provide approvals for Drafts without providing the requisite information

16             and advice to Plaintiff-Creators "necessary in order to render such Draft

17             acceptable to Licensor" per Section 2(a)(iii) of the License Agreement; and

18         c.    by engaging in the other breaches set forth above.

19     57.    This termination was outside the confines of the Termination Provisions of the

20  contract and was without legal basis.

21     58.    Plaintiff-Creators have been damaged by Defendant's breaches of contract.

22  Plaintiff-Creators' total damages are as yet unascertained, but are in an amount to be established

23  subject to proof at trial, and which on information and belief, is in excess of $10 million.

24  ///

25  ///

26  ///

COMPLAINT
Case No.
Page No. 16

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

1

2

### SECOND CLAIM FOR RELIEF

### (Breach of Implied Duty of Good Faith and Fair Dealing)

59.     Plaintiff incorporates by this reference each and every allegation contained in paragraphs 1 through 58, inclusive, as if set forth in full herein.

60.     The License Agreement between Plaintiff-Creators and Defendant contained an implied covenant of good faith and fair dealing by and between the parties, which prohibits them from engaging in any activity or conduct which would prevent the other party from receiving the benefits of the contract.

61.     Plaintiff-Creators have fully performed all covenants, conditions and obligations required to be performed by reason of the contract, except to the extent waived, excused or made impossible by Defendant's breach of contract.

62.     Defendant, in acting or failing to act as set forth above, breached the implied covenant of good faith and fair dealing. In particular, but without limitation, Defendant's backdoor termination of the License Agreement on the pretext of "we will not approve any future drafts" was a stunning act of bad faith that completely destroyed the value, purpose and protections of the License Agreement. It is no small irony that most of the terms that Defendant unilaterally jettisoned (such as, *inter alia,* the approvals provision and the termination provision) were terms that Defendant *itself* had insisted upon including in the License Agreement during the negotiation process.

63.     Not only was Defendant's statement that "we will not approve any future drafts" a clumsy effort to circumvent the termination provisions (because, of course, there was no ground for termination), it undermined the fundamental structure of the contractual relationship whereby the Defendant-Licensor would provide Plaintiff-Creators the opportunity and roadmap to "fix"/rewrite/cure any valid concerns related to the protection of the Dungeons & Dragons brand with respect to approvals. In any event, Defendant had already approved the essential storylines, plots, characters, creatures, and lore for the new Dragonlance trilogy when it approved Plaintiff-

COMPLAINT
Case No.
Page No. 17

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

Creators' previous drafts and story arc, which were complete unto themselves, were delivered prior to execution of the License Agreement, and are acknowledged in the text of the License Agreement. In other words, Defendant's breach had nothing to do with Plaintiff-Creators' work; it was driven by Defendant's response to its own, unrelated corporate public relations problems—possibly encouraged or enacted by its corporate parent, Hasbro, Inc.

64.     Defendant's backdoor termination also had the effect—which was fully known and intended by Defendant—of destroying the value of the painstaking work that Plaintiff-Creators had performed over the course of years in preparing and writing the works. Defendant was aware that Book 1 was basically complete and that Book 2 was substantially in progress and that the story arc of Book 3 was in place from the beginning. Additionally, Defendant's acts of bad faith nullified every effort the Plaintiff-Creators had undertaken to enact the "suggested" (really mandatory) "notes" and direction issued by Defendant along the way with respect to textual/conceptual revisions to Book 1. Further, Defendant's bad faith conduct of, knowingly, maliciously, and intentionally "pulling the license" and terminating the License Agreement had the effect of interfering with and destroying the value of Plaintiff-Creators' lucrative book deal with PRH, of which deal Defendant was cognizant all along.

65.     None of Defendant's bad faith conduct is privileged under the License Agreement or any of its terms, including but not limited any alleged limitation of liability.

66.     As a direct and proximate result of Defendant's bad faith and breach of the implied covenant of good faith and fair dealing, Plaintiff-Creators suffered and will continue to suffer damages in an amount not yet fully ascertained and in an amount to be proven at trial, but which is believed to be in excess of $10 million.

## THIRD CLAIM FOR RELIEF

### (Tortious Interference with Contract)

67.     Plaintiff incorporates by this reference each and every allegation contained in paragraphs 1 through 66, inclusive, as if set forth in full herein.

COMPLAINT
Case No.
Page No. 18

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

68.     On or about March 29, 2019, Plaintiff-Creators and PRH entered into the Publishing Agreement.

69.     At all relevant times, Defendant was aware of the Publishing Agreement and its terms: Defendant approved a draft of the Publishing Agreement; in the License Agreement, Defendant pre-approved PRH as the publisher for Plaintiff-Creator's works under the License Agreement; and the License Agreement expressly refers to the Publishing Agreement as being attached thereto. License Agreement at § 3(a) ("Licensor acknowledges receipt of the synopsis and treatment provided by Licensee that is the basis for having secured the attached agreement with Publisher.").

70.     Defendant intentionally caused Plaintiff-Creators to breach the Publishing Agreement by preemptively refusing to provide any further approvals of Plaintiff-Creators' Dragonlance work, which approvals are necessary for Plaintiff-Creators to perform under the Publishing Agreement.

71.     On information and belief, Defendant also engaged in back-channel activities to disrupt the Publishing Agreement by convincing PRH that Defendant would prevent Plaintiff-Creators from performing under the Publishing Agreement.

72.     Defendant substantially interfered with the Publishing Agreement through improper means—to wit, conduct that constitutes breach (actual or anticipatory) of the License Agreement.

73.     As a direct and proximate result of the above-described acts and omissions of Defendant, Plaintiff-Creators have and will suffer damages. The full nature and scope of those damages are presently unascertained and are subject to proof at trial, but are, on information and belief, are in excess of $10 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Creators pray for judgment against Defendant as follows:

1.   On the First Claim for breach of contract:

COMPLAINT
Case No.
Page No. 19

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

1        a.   for damages in an amount subject to proof at trial;

2        b.   for interest on the sum awarded at the highest rate allowed by law; and

3        c.   for an order enjoining Defendant to specifically perform under the License

4            Agreement by providing approval or instructions for revisions that will obtain

5            Defendant's approval for publication of the new Dragonlance trilogy.

6    2.  On the Second Claim for breach of the implied covenant of good faith and fair

7        dealing:

8        a.   for all damages, including actual, consequential, and incidental, according to

9            proof at trial; and

10       b.   for an order enjoining Defendant to specifically perform under the License

11           Agreement by providing approval or instructions for revisions that will obtain

12           Defendant's approval for publication of the new Dragonlance trilogy.

13   3.  On the Third Claim for tortious interference with contract:

14       a.   for all damages, including actual, consequential, and incidental, according to

15           proof at trial.

16   4.     For costs of suit incurred herein and for attorneys' fees, which are specifically

17   allowable per contract; and

18   5.     For such other and further relief as the Court deems just and proper.

19                                    **<u>DEMAND FOR JURY TRIAL</u>**

20       Plaintiffs hereby demand a jury trial of all issues in the Complaint that are triable to a

21   jury.

22   ///

23   ///

24   ///

25   ///

26   ///

PARSONS, BEHLE & LATIMER
1032 34th Avenue E
Seattle, Washington 10001
Tel: (801) 536-6761

1    DATED THIS 16th day of October, 2020.

2

3                                                    PARSONS BEHLE & LATIMER

4                                                    By____/s/ Margaret Niver McGann___

5                                                        Margaret Niver McGann
                                                         Washington State Bar Number 49582
6                                                        mmcgann@parsonsbehle.com

7                                                        PARSONS, BEHLE & LATIMER

8                                                        1032 34th Avenue E
                                                         Seattle, Washington 98112
9                                                        Tel: (801) 536-6761
                                                         Fax: (801) 536-6111

10                                                       WEINTRAUB TOBIN
11                                                       LAW CORPORATION
                                                         David R Gabor (*pro hac pending*)
12                                                       Josiah M. Prendergast (*pro hac pending*)__
                                                         10250 Constellation Blvd., Suite 2900
13                                                       Los Angeles, California 90067
                                                         Tel: (310) 858-7888
14                                                       Fax: (310) 550-7191
                                                         Email: dgabor@weintraub.com

15                                                       Attorneys for Plaintiffs
16                                                       Margaret Weis, LLC and Tracy Hickman

17

18

19

20

21

22

23

24

25

26

COMPLAINT                                                    PARSONS, BEHLE & LATIMER
Case No.                                                                    1032 34th Avenue E
Page No. 21                                                         Seattle, Washington 10001
                                                                           Tel: (801) 536-6761

PBL\29722.001\4835-0260-0143v1-10/16/20